**In re AUTO SPECIALTIES MANUFAC-TURING COMPANY, Debtor.**

**James W. BOYD, Trustee, Plaintiff,**

**v.**

**Benjamin G. SACHS and Manufacturers National Bank of Detroit, Defendants.**

**Bankruptcy No. SK 88–03095. Adv. Proc. No. 88–0527.**

United States Bankruptcy Court, W.D. Michigan, S.D.

March 31, 1993.

See also 134 B.R. 227.

Drew, Cooper & Anding (John E. Anding and Christopher G. Hastings, briefed), Grand Rapids, MI, sp. counsel for plaintiff Trustee.

Gardner, Carton & Douglas (Robert H. Skilton III, argued), Chicago, IL, sp. counsel for plaintiff Trustee.

Varnum, Riddering, Schmidt & Howlett (Jeffrey R. Hughes, argued and briefed), Grand Rapids, MI, for defendant Mfrs. Nat. Bank of Detroit.

Garratt & Evans, P.C. (Mark D. Evans, argued and briefed), Bloomfield Hills, MI, for defendant Benjamin G. Sachs.

### OPINION AND ORDER GRANTING MOTIONS TO DISMISS PREFERENCE COUNTS

JO ANN C. STEVENSON, Bankruptcy Judge.

### I. Introduction.

The matters now before the court are the motions for summary judgment filed by Defendants Benjamin G. Sachs ("Sachs") and Manufacturers National Bank of Detroit ("Manufacturers" or "Bank") on the respective counts of the complaint in which successor Trustee James W. Boyd ("Trustee") seeks to recover $300,000 from both or either defendant as a preference. While

both defendants have asserted a number of theories upon which they claim they are entitled to summary judgment, the assertion that Sachs did not receive a preference because under 11 U.S.C. § 547(b)(5) Sachs did not improve his position is persuasive. We therefore grant both motions for summary judgment.

## II. Jurisdiction.

Jurisdiction exists in this matter under 28 U.S.C. § 1334(b), preference matters being core proceedings under 28 U.S.C. § 157(b)(2)(F). This court is therefore empowered to enter final orders subject only to appeal under 28 U.S.C. § 158(a).

## III. Statement of facts.

The facts of this case are set out at length in the court's January 28, 1993 Opinion and Order Granting Manufacturers National Bank of Detroit's Motion for Partial Summary Judgment and Combined Report and Recommendation and Opinion and Order Denying in Part and Granting in Part Benjamin G. Sachs' Motion for Partial Summary Judgment (the "Equitable Subordination Opinion"), reported as *Boyd v. Sachs (In re Auto Specialties Manufacturing Co.)*, 153 B.R. 457 (Bankr.W.D.Mich.1993). Only those facts necessary to the motions under consideration are repeated here. Given the thorough discussion contained in that opinion, the court finds it unnecessary to reiterate the standard of review applicable in the summary judgment context.

The preference counts asserted by the Trustee arise out of a modification to an Irrevocable Letter of Credit (the "Credit") in which the issuer was Manufacturers, the account party (sometimes also referred to as customer) was AUSCO, and the beneficiary was Sachs. The Credit, dated May 13, 1987, was originally issued in the stated amount of $400,000 as part of a bonus negotiated by Sachs in connection with his second employment agreement with AUS-CO. That employment agreement between Sachs and AUSCO, dated March 16, 1987, was amended on April 28, 1987 and as amended contained the following provision regarding the bonus:

It now appears that it will be more difficult to resolve the Corporation's [AUS-CO's] financial difficulties than Executive [Sachs] previously believed. In addition, the Corporation, as well as its shareholders and directors, acknowledge that the continued involvement of Executive is necessary in order to ensure the continued cooperation of crucial parties involved with the Corporation. For the foregoing reasons, Executive is unwilling to continue his employment, to devote the amount of time necessary, and to forego certain other opportunities, unless the Corporation remits to the Executive as an inducement to continue his employment, the sum of $500,000. *As an accommodation to Corporation, Executive agrees that the said sum of $500,000 shall be paid $100,000 immediately upon the execution of this Agreement, and the balance of $400,000 exclusively pursuant to the Letters of Credit attached hereto as Exhibit A, provided, in the event draws under the Letters of Credit are preliminary or permanently enjoined, or the Letters of Credit are held by any court to be invalid or unenforceable in whole or in part, or upon the happening of any of the events set forth in Paragraph 4 below, the balance of the said sum of $400,000 then unpaid shall be immediately due and payable.*

Sachs' Brief in Support of Motion to Dismiss Count X of AUSCO's Third Amended Complaint ("Sachs' Brief"), Exhibit D (emphasis supplied). Paragraph 4 of the employment agreement states as follows:

*Termination by Executive.* If, (a) during the Term of the Agreement, (including any extension thereof), a petition in bankruptcy (whether under the Federal Bankruptcy Code or under any successor or similar state or federal statute) is filed by or against the Corporation, and if, during such bankruptcy proceedings and without his consent, Executive shall be removed as President or Chief Executive Officer of the Corporation, or Executive shall be prevented from effectively ful-

filling the duties of such offices, or (b) any payments due to Executive under this Agreement are not paid and received by Executive when due, (c) or any provision of this Agreement is declared invalid, void, or unenforceable by any court for any reason, or (d) *any litigation shall be commenced against, or involving, Executive, seeking the termination or modification of this Agreement, or the return by Executive of any amounts previously received from Corporation,* (e) or Executive shall be required to disgorge any amounts previously received from Corporation, then, in such event Executive shall be entitled to forthwith resign as an officer and employee of the Corporation and any balance of the salary payable pursuant to paragraph 3(a) above shall be immediately due and payable. The right to receive the amounts pursuant to paragraph 3(b) shall be unaffected by such resignation.

Sachs' Brief, Exhibit C at 4 (emphasis supplied). Litigation between AUSCO and Sachs over the performance and breach of the employment contract is ongoing. The decision on the motions presently pending does not affect AUSCO's right to collect from Sachs if it is successful in that litigation.

There is no dispute that the Credit was issued outside of the 11 U.S.C. § 547(b)(4)(B) one year preference period. As originally drafted, the Credit provided that payment under it would be made upon presentation of a sight draft in a form set forth in Annex 1 to the Credit in the amount of either $150,000 or $250,000. However, the Credit further provided that the sight draft was to be accompanied by a certification signed by Sachs in the form attached to the Credit as Annex 2 in the event of a $150,000 draw, or Annex 3 in the event of a $250,000 draw. Annex 2 consisted of a certification which was to be made by Sachs. The first matter to be certified was that the draw was made "with respect to a payment of amounts required to be paid by the Company to Benjamin Sachs pursuant to the terms of the Employment Agreement." The second matter Sachs

was to certify was that one of the following conditions had been met:

(i) The indebtedness evidenced by the Liquidation Facility Note (as defined in the Loan Agreement dated September 11, 1985 between the Company and the Bank, as amended, the "Loan Agreement") has been reduced to $500,000 and the Company is not in default of section 5.9 of the Loan Agreement, (ii) The amount available under section 5.9(ii) of the Loan Agreement is not more than $500,000 and the Company is not in default of section 5.9 of the Loan Agreement, or (iii) The Indebtedness (as defined in the Loan Agreement) has been paid in full.

Sachs' Brief, Exhibit F at 5. The certification in Annex 2 was accompanied by a form Addendum to Loan and Collateral Report to be submitted and signed by AUSCO. This document separately repeated the three conditions quoted above accompanied by check boxes to indicate whether the condition had been met. Annex 3 was in substantially the same form, with one change. Instead of requiring that the indebtedness be reduced to $500,000, in order for Sachs to make a $250,000 draw, the indebtedness had to be reduced to $200,000. Reading the two Annexes together, Sachs would have been able to draw down the full amount of the Credit at any time prior to its expiration after the Bank's exposure had been reduced to $200,000.

The Credit was issued pursuant to a Standby Letter of Credit Application and Agreement (the "Application and Agreement") dated May 15, 1987 between the Bank and AUSCO which was signed on AUSCO's behalf by James Tiscornia and Loren Gerber. As provided in both the Credit and the Application and Agreement the expiration date of the Credit was the earlier of either its surrender for cancellation or June 1, 1989.

On February 9, 1988, Manufacturers and AUSCO entered into a Second Amendment To Loan Agreement. That agreement provided, among other things, that the Credit was to be amended so that Sachs could immediately draw $300,000 on the Credit

without satisfying the conditions originally required under the terms of the Credit as originally issued. See Sachs' Brief, Exhibit J. At the same time, Sachs' employment contract was also modified to permit Sachs to draw against the Credit as modified. The amendment to the employment agreement further provided that upon the receipt of $300,000 under the modified Credit, the Credit would be surrendered to the Bank for cancellation. Sachs' Brief, Exhibit I. Also on the same date Sachs drew on the Credit consistent with the new agreement reached by all the parties. The Trustee asserts that as a result of this transaction Sachs and the Bank were the recipients of a $300,000 preference.

On October 3, 1988 AUSCO filed chapter 11 bankruptcy in this court; the case was converted to a chapter 7 proceeding on February 6, 1990.

### IV. The Defendants' preference liability generally.

■ We begin our analysis, as always, with the applicable Bankruptcy Code provision. 11 U.S.C. § 547(b) establishes the five elements of a preference:

Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

The only "transfers" made within one year of bankruptcy in connection with the Credit were the modification of the Credit, and the payment to the Bank pursuant to the modification. Because all of these transfers were made more than ninety days before the date of bankruptcy the Trustee must pursue both Sachs and the Bank under § 547(b)(4)(B). Sachs falls within this provision because as president of AUSCO he was an insider. 11 U.S.C. § 101(31)(B)(ii). Although the Trustee has contended at various times that Manufacturers was an insider because it controlled AUSCO, the issue of control was resolved in the Bank's favor in the Equitable Subordination Opinion. In order to survive summary judgment, the Trustee must therefore have a cause of action against the Bank as a non-insider.

As a non-insider being pursued for a preference outside the 90 day period set forth in § 547(b)(4)(A), the Bank's liability must be premised upon the doctrine set forth in *Levit v. Ingersoll Rand Financial Corp. (In re V.N. Deprizio Constr. Co.)*, 874 F.2d 1186 (7th Cir.1989) and adopted by the Sixth Circuit in *In re C–L Cartage Co.*, 899 F.2d 1490 (6th Cir.1990). *Deprizio* and *C–L Cartage* held that a non-insider lender may nonetheless have preference liability under § 547(b)(4)(B) for payments made to it during the insider preference period where its indebtedness is guaranteed by an insider whose liability is reduced by the payments. While we question whether *Deprizio* is applicable to the fact pattern in this case, it is unnecessary to resolve this issue. As a non-insider, the Bank's liability must be rooted in a preferential transfer to an insider, in this case Sachs. If the Trustee has no claim against Sachs, he has none against Manufacturers.

The strongest argument raised by Sachs and Manufacturers questions whether the Trustee has raised the requisite issue of fact as to the § 547(b)(5) requirement that Sachs received more as a result of the transfer than he would have had the trans-

fer not been made and the case been filed under chapter 7. In the context of this case, the issue is whether Sachs would have been entitled to draw at least $300,-000 on the Credit on or before its expiration date of June 1, 1989 had the Credit not been modified and had AUSCO filed chapter 7 bankruptcy on October 3, 1988.

The Trustee has parried the argument that Sachs would have fared as well in a § 547(b)(5) hypothetical chapter 7 with three thrusts. The first is that the Credit also incorporated the terms of Sachs' employment contract with AUSCO and that Sachs breached this contract. Second, the Trustee argues that Sachs would not have recovered anything in the hypothetical chapter 7 because the Manufacturers' indebtedness would not have been reduced to the requisite level before the Credit expired. Finally the Trustee contends that the court should not treat this as a letter of credit transaction because the modification and payment of the Credit both occurred on the same day. He argues that instead this was a new letter of credit. Although these lunges were made with great gusto, they all miss their mark, the law providing an effective riposte for each.

## A. Conditions upon which the Credit could be paid.

■ While the parties have failed to cite any authority on this issue, the question of whether Sachs' performance of the underlying contract was a condition of payment under the Credit is conclusively addressed in the body of law governing documentary credits. The beginning point in our survey is the doctrine known as the "independence principle," and is explained as follows by Professor John F. Dolan:

> In the broad credit transaction itself, that is, the relationships of all three parties (account party [AUSCO], issuer [Manufacturers], and beneficiary [Sachs]), it is important to distinguish the credit from other contracts and from the acceptance. Generally, the broad credit transaction consists of three separate relationships:

> 1. The relationship between the issuer and the beneficiary;
> 2. The relationship between the beneficiary and the account party; and
> 3. The relationship between the account party and the issuer.

> The first is the letter of credit engagement; the second is usually called the underlying contract; and the third is called the application agreement. The acceptance arises out of an acceptance credit that calls for time drafts. When the beneficiary presents these drafts, the issuer accepts them and thereby becomes liable on the acceptance, a negotiable instrument. Analysis of letter of credit transactions depends on proper differentiation of these related contracts and the acceptance, on the one hand, and the letter of credit on the other.

> Letter of credit law assumes that the credit will not succeed unless the credit engagement is independent of these related contracts. This rule of credit law is the independence principle, which plays a central role in letter of credit analysis.

JOHN F. DOLAN, THE LAW OF LETTERS OF CREDIT, ¶ 2.01 (2D ED. 1991). THE INDEPENDENCE PRINCIPLE IS A CRUCIAL FACET BOTH OF THE LAW OF LETTERS OF CREDIT AND THIS CASE. THE ENTIRE PURPOSE OF USING SUCH LETTERS AS A DEVICE OF PAYMENT IS TO PROVIDE A MEANS OF ASSURING PAYMENT AT THE INCEPTION OF THE CONTRACT REGARDLESS OF WHAT HAPPENS IN THE COURSE OF PERFORMANCE SO THAT THE PAYMENT MECHANISM DOES NOT ITSELF BECOME AN ADDITIONAL LITIGATION BATTLEGROUND. THIS IN TURN INDUCES FINANCIAL INSTITUTIONS TO PROVIDE AN INEXPENSIVE, ACCESSIBLE MEANS OF HANDLING THE PAYMENT PORTION OF THE TRANSACTION. IN THIS ASPECT THE INDEPENDENCE PRINCIPLE IS MUCH LIKE THE HOLDER IN DUE COURSE DOCTRINE WHICH APPLIES TO NEGOTIABLE INSTRUMENTS. BOTH RULES FACILITATE COMMERCE BY INSULATING THE CHANNELS THROUGH WHICH MONEY FLOWS.

Article 5 of the Uniform Commercial Code governs letters of credit generally, and codifies the independence principle in § 5–109(1) (MICH.COMP.LAWS ANN. § 440.-5109(1)), providing in part that:

An issuer's obligation to its customer includes good faith and observance of any general banking usage but unless otherwise agreed does not include liability or responsibility

(a) for performance of the underlying contract for sale or other transaction between the customer and the beneficiary. . . .

U.C.C. Section 5–114(1) (MICH.COMP.LAWS ANN. § 440.5114(1)) further clarifies that the independence principle holds true even where the underlying contract between the account party and beneficiary is breached:

An issuer must honor a draft or demand for payment which complies with the terms of the relevant credit regardless of whether the goods or documents conform to the underlying contract for sale or other contract between the customer and the beneficiary. . . .

If the Credit had contained no reference to the underlying contract, then clearly under these two provisions a breach by Sachs would not affect the Bank's obligation to pay upon presentation of conforming drafts. However, AUSCO argues that the statement in the Annexes that payment was being made "pursuant to" the employment agreement changes this outcome. While under ordinary rules of construction this language might be sufficient to incorporate the terms of one contract into another, a letter of credit is not an "ordinary" contract. In this case, the contract between AUSCO and Manufacturers disavowed any obligation on the part of Manufacturers to pay only if Sachs was not in breach of his contract and by doing so rendered the reference in the credit to the underlying contract surplusage.

The Application and Agreement accomplished this through its incorporation of a source frequently referred to in examining letters of credit, the UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS, (Int'l Chamber of Commerce 1983) (the "UCP"). The UCP provides that it may be incorporated into agreements by reference, Article 1, and such was the case in this instance; the Application and Agreement incorporated the UCP in its ¶ 5. The UCP in Article 3 contains its own restatement of the independence principle:

Credits, by their nature, are separate transactions from the sales or other contract(s) on which they may be based and banks are in no way concerned with or bound by such contract(s), *even if any reference whatsoever to such contract(s) is included in the credit.*

(Emphasis supplied). Article 4 expands upon this concept:

In credit operations all parties concerned deal in documents, and not in goods, services, and/or other performances to which the documents may relate.

Under the UCP, which AUSCO and the Bank agreed governed their transaction, references to the underlying employment contract did not serve to incorporate that contract into the Credit.

This result also finds support in the Sixth Circuit's decision in *Bossier Bank & Trust Co. v. Union Planters Nat'l Bank of Memphis,* 550 F.2d 1077 (6th Cir.1977). In that case the beneficiary, Bossier Bank, argued that the issuer of the credit, Union Planters, wrongfully dishonored a sight draft presented by Bossier Bank. The account party, Shreve Square on the River, Inc., had a loan commitment with Bossier Bank. The credit provided that Union Planters would honor sight drafts up to an amount of $450,000 on the following condition:

The draft is to be accompanied by your written statement to the effect that you are entitled to draw against this Letter of Credit in reduction of the loan made to Shreve Square on the River, Inc., pursuant to the terms of your commitment letter dated June 21, 1973.

*Id.* at 1079. Bossier Bank presented a sight draft accompanied by an affidavit satisfying this condition which Union Planters dishonored, alleging fraud:

Defendant asserts in its motion that Bossier fraudulently "called" the letter of credit because the purpose for which Bossier sought to have it honored was not the purpose contemplated by the parties to the underlying contract and that if

fraud is involved the issuer is not obligated to honor the drafts of the beneficiary. *Id.* at 1080. This argument was rejected by the district court in an opinion which was adopted in its entirety by the Sixth Circuit on the basis that fraud must be shown in the making of the contract rather than the drawing on the letter of credit. *Id.* at 1082.

Another argument explicitly rejected by the district court and the Sixth Circuit was that the requirement that the draw be made "pursuant to the terms" of the commitment letter incorporated by reference the commitment letter which in turn incorporated yet another commitment letter establishing conditions precedent to drawing on the letter of credit. The courts refused to interpret the letter of credit to incorporate the underlying contract documents in part because the independence principle applied:

> The court cannot accept U.P.'s [Union Planters'] invitation [to look to the underlying contract] for the reasons heretofore stated and for the further reason that U.P. drafted the letter of credit.... As stated earlier, the letter of credit constitutes an independent contract between U.P. and Bossier.

*Id.*

This is not a unique result. Other cases holding similarly include *Banco Nacional de Desarrollo v. Mellon Bank, N.A.,* 726 F.2d 87 (3d Cir.1984) and *Pringle-Associated Mortgage Corp. v. Southern Nat'l Bank of Hattiesburg, Mississippi,* 571 F.2d 871, 874 (5th Cir.1978) ("General references to underlying agreements are surplusage and should not be considered in deciding whether the beneficiary has complied with the terms of the letter of credit."). Although not binding precedent, the Sixth Circuit's unpublished disposition in *Banco Continental v. First Nat'l Bank of Gatlinburg,* 762 F.2d 1005 (Table) (6th Cir. April 30, 1985) (No. 84-5378—text in Westlaw) is yet another example of a court reaching the same conclusion.

The only basis upon which *Bossier Bank* may arguably be distinguished from the instant case is that referring to the underlying documents favored the issuer in *Bossier Bank,* while in this case referring to the underlying documents would favor the account party. Because in both cases the credit in controversy was drafted by the issuer, it could be argued that the rule of construction against the drafter comes into play. However, that rule does not work against Manufacturers in this case for the following three reasons.

First, the hypothetical nature of our query must be kept in mind. The Trustee's position is that, had the letter of credit not been modified, Sachs would still not have been paid because the Bank would have had to dishonor his draft based upon his breach of the underlying contract. Had this occurred, there would have been no distinction at all between the claim Sachs would then have had against Manufacturers and Bossier Bank's claim against Union Planters.

Second, Manufacturers' liability is derivative of Sachs'. The Trustee must therefore sustain the existence of a fact issue as to Sachs before he can seek to have any contract construed against Manufacturer, presumably the drafter of the Credit. In his dispute with Sachs, however, this rule of construction favors neither party. Thus, the differing posture of the parties would present no reason from departing from the separate application of the independence principle in *Bossier Bank.*

Third, even if the Credit could be construed against Sachs, reference to the underlying employment contract establishes that the parties intended breach of contract claims by AUSCO to *trigger* payment of the bonus, not forestall it. Under the amendment to the employment contract, any litigation against Sachs by AUSCO would render the bonus immediately payable, as would any attempt to enjoin payment under the letter of credit. These provisions are probative of an intent of the parties to assure payment of the bonus if the benchmarks were met notwithstanding the status of the employment agreement and therefore support a construction of the Credit consistent with the independence principle.

Application of the principle in this case does not deprive AUSCO and Sachs of their contract rights, but it does deprive them of the ability to draw the issuer who facilitated their transaction into their dispute. Although a party may attempt to defeat the independence principle in a later suit by arguing that it is unfair to compel payment under a breached contract, it must be remembered that the inviolate nature of credits allowed the contract to be formed in the first place. For example, in this suit Sachs initially insisted on a cash bonus. After strenuous negotiations, Ronald Rose dep., Vol. II at 302, the parties settled on a bonus which was to be paid in part through the Credit. The Credit was the next best thing to cash, because it was a mode in which payment could be guaranteed if the conditions *agreed upon by the parties at that time* were satisfied. If AUSCO wanted to require that Sachs also not be *in breach* of his contract, it could have negotiated for that, although at that point the transaction might begin to lose the semblance of a letter of credit transfer. *See, e.g. Wichita Eagle & Beacon Publishing Co. v. Pacific Nat'l Bank*, 493 F.2d 1285 (9th Cir.1974). But in the end, no such term appeared in the Credit.

In view of the foregoing, we find that *Bossier Bank* is controlling in this case and that the Credit did not incorporate the terms of the underlying contract. We therefore hold as a matter of law that, assuming the other conditions of the Credit were satisfied, Sachs would have been entitled to draw on the Credit regardless of the status of his employment contract with AUSCO. His ability to draw against the Credit did not relieve him of any breach of contract liability that he may have had to AUSCO arising out of his performance under the employment agreement, but neither did any breach of that contract affect his right to initially draw upon the Credit.

## B. Satisfaction of the condition.

Having established that any breach of the underlying contract by Sachs would not as a matter of law have been a breach of the Credit's terms, the only issue remaining is whether AUSCO's liability to the Bank would have been reduced to $200,000 before the Credit expired had the Credit not been modified. Various arguments were made as to whether a trustee in a hypothetical chapter 7 would have made a distribution to Manufacturers before the letter of credit expired, thus satisfying its condition. It is unnecessary to address the bulk of these arguments, as the result in this case is controlled by *Neuger v. United States (In re Tenna Corp.)*, 801 F.2d 819 (6th Cir.1986). In *Tenna* the underlying bankruptcy was initially commenced as a chapter 11 proceeding, during the course of which the debtor incurred a number of superpriority liens. The case then converted to chapter 7 and the chapter 7 trustee brought a preference suit against the United States for payments made to the Internal Revenue Service during the preference period. The United States limited its defense to the § 547(b)(5) issue, contending that that section required construction of a hypothetical chapter 7 distribution on the date of filing. Under this scenario, the government argued, the liens it would have had had not the prepetition payment been made would have been secured by the property that ultimately was pledged to the superpriority creditors. The IRS therefore would have received as much in the hypothetical chapter 7 distribution as it did in the alleged preferential transfers. The Trustee countered that the hypothetical distribution should instead be constructed as of the date of the filing of the adversary proceeding to avoid the preference, by which time the superpriority liens had consumed the bulk of the estate. The bankruptcy court and district court both agreed with the trustee.

The Sixth Circuit reversed, adopting the test posed by the United States. Although it was a fiction to believe that an estate could be liquidated and distributed in one day, the court believed that this fiction was necessary in order to avoid manipulation of claims by the trustee:

> The bankruptcy court stated that it was "inconceivable and illogical" to construct a hypothetical Chapter 7 liquidation as of the date the petition was filed in this

case. *We believe that it is "inconceivable and illogical" to assume that Congress intended to permit the estate's trustee to control the timing for testing whether a payment can be avoided as a preference....* We agree with the government that such a reading of the Code invites manipulation and that, we must assume, was not Congress' intent.

*Id.* at 823 (emphasis supplied).

■ While the facts of the present case are not identical, the rationale in *Tenna* is controlling. The policy behind *Tenna* is to fix the trustee's rights as of the date of bankruptcy regardless of what might happen post-petition. As a result a hypothetical chapter 7 trustee has no more ability to manipulate the case than did the actual trustee in *Tenna,* because in the hypothetical the trustee's job is accomplished immediately on the date of filing. We need not speculate whether the hypothetical trustee would have delayed distribution until the Credit expired because *Tenna* sets the date of that distribution.

■ Neither does it make a difference that under the facts of this case the hypothetical distribution is only a trigger which then would have caused Sachs to be paid in full. The intervention of AUSCO's bankruptcy would not have prevented Sachs from drawing on the Credit, nor would the Bank have been barred from including the amount of the draw in its secured claim. *In re M.J. Sales & Distributing Co., Inc.,* 25 B.R. 608, 614 (Bankr.S.D.N.Y.1982). Therefore, even assuming (contrary to Sachs' argument) that Sachs' claim was unsecured, the alleged preference resulted in a dollar for dollar reduction in the estate's liability on Manufacturer's fully secured claim.

■ This is sufficient to establish that the § 547(b)(5) test is not met in this case. Under § 547(b)(5)(C), there is no requirement that the distribution in the hypothetical chapter 7 flow directly from the estate to the preference defendant. Instead, the purpose of the § 547(b)(5) test is to determine whether the creditor improved its position vis-á-vis the estate as a result of the preference. "Pursuant to section 547(b)(5),

the bankruptcy 'court must decide the transferee's class and determine what distribution that class would have received had the transfer not been made.' 2 Collier On Bankruptcy § 547.08." *Bluegrass Ford–Mercury, Inc. v. Farmers Nat'l Bank of Cynthiana (In re Bluegrass Ford–Mercury, Inc.),* 942 F.2d 381, 385 (6th Cir.1991). This analysis is meant to foster the policy of equality of distribution: "[M]ore important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 177–78 (1977), U.S. Code Cong. & Admin.News 1978, pp. 5787, 6138. In the hypothetical chapter 7, the unsecured class are actually in a *worse* position without the transfer to Sachs because in the hypothetical he would have been entitled to draw $400,000 instead of the $300,000 he actually received.

**C. Stepping together the underlying transaction and the Credit.**

■ Special counsel for the Trustee vigorously argued at the March 19, 1993 hearing that the court should not treat this transaction as an ordinary credit transaction because the modification was tantamount to a new letter of credit. This conclusion was supported, he contended, by statements contained in Sachs' brief to the effect that prior to modification the Credit was virtually valueless. This argument is unconvincing at best. The independence principle clearly prohibits the stepping together of these transactions. Exceptions to the independence principle are made for fraud in the underlying transaction, *see* Mich.Comp.Laws Ann. § 440.5114(2), but no one has argued that fraud is present in this case. The Trustee has cited no law for the proposition that an exception to the principle should exist if the transaction occurred in one day or if a substantial modification to the letter credit is made. The court's independent research unearthed no such authority. The whole point of a credit

transaction is to remove the vagaries of the underlying transaction from contention. Violence need not be done to this commercial mechanism in order to uphold the preference provisions.

 Even if this transaction could be stepped together, the Trustee fares no better. Although special counsel asserted that Sachs believed the unmodified Credit was valueless because the prospect of satisfying the conditions was bleak, the surrender of the Credit, which was part of the stepped-together transaction, cannot be so glibly dismissed. Even if the transaction is collapsed the result under § 547(b)(5) is the same, regardless of what Sachs believed at the time of the modification. Had this transaction not taken place, Sachs would have retained the unmodified Credit. Although he might have believed the Credit to be worthless at the time, it would have been worth $400,000 in the hypothetical chapter 7 which would have followed October 3, 1988. Had this alleged preference not been made, whether stepped together or not, Sachs would have received a $400,000 payment as a result of the hypothetical chapter 7 distribution.

## V. Order.

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Sachs' Motion to Dismiss Count X of AUSCO's Third Amended Complaint is granted in its entirety; and

**IT IS FURTHER ORDERED** that Manufacturers' Motion for Summary Judgment With Respect to Count VIII of AUSCO's Third Amended Complaint is also granted in its entirety.